**Allen Philip HAMILTON, Jr., Appellant,**

**v.**

**COMMANDING OFFICER, ARMED FORCES EXAMINING AND INDUCTION STATION, Appellee.**

**No. 18898.**

United States Court of Appeals
Ninth Circuit.

Feb. 28, 1964.

J. B. Tietz, Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Donald A. Fareed, Asst. U. S. Atty., Chief, Civil Section, and Morton H. Boren, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, MERRILL and KOELSCH, Circuit Judges.

CHAMBERS, Circuit Judge.

Hamilton was inducted into the army on July 29, 1963, by appellee. He wants out. He complains of the procedures used and the rulings of his draft (selective service) board. In his last year before induction, he was asserting the condition of his mother as a reason for a dependency exemption or deferment.

At about the hour of Hamilton's induction, his attorney filed in a United States district court a petition for a writ of habeas corpus. The validity of the induction was tried before the district court and all relief denied. On this appeal, we affirm the order of the district court.

As is normal in such a case, there is a thick file from the selective service board. We detail some of the chronology we find there.

Hamilton was 18 years old on October 17, 1955, and a few days thereafter registered with Local Board No. 30, Richmond, California. It would appear that his status as a college student kept the army away from his door until some time in 1960 or 1961. For about two years in 1960–1962 he did not get inducted chiefly because of injuries in an automobile accident which lingered on. His father died January 21, 1961, leaving his wife, Barbara, and son Allen, the appellant here, surviving. On July 22,

1961, Allen married Stephanie Abbott.[1] By this time, he had taken a job as a salesman with a Los Angeles jewelry firm. He started at a small salary while his wife continued to work in a San Francisco store.

By October, 1962, Hamilton and his wife, Stephanie, had moved to Los Angeles, he was prospering as a salesman, and she had apparently ceased to work for an employer. After his marriage, he began to press the board with the point that his mother was suffering from Parkinson's disease and was dependent upon him. We think the following chronology is important:

1. On an information questionnaire dated September 15, 1961, submitted by Hamilton, but not filed until October 10, 1961, he said nothing of his mother's dependency.

2. On October 18, 1961, Hamilton sent the board a "notice of change" reporting, inter alia, as a change in dependency status, the following: "[E]ntire support of my mother—not able to support herself as she has Parkinson's disease." He also reported the father's death on January 21, 1961.

3. On March 25, 1962, he filled out a dependency report which was filed March 30, 1962, in which he reported that he was giving support to his mother in the amount of $75.00 per month. He also said in a statement approved and signed by his mother, "I contribute her entire monthly income with the exception of a small amount that my father left her. He died January, 1961—my mother has a nervous disease called Parkinson's disease—she is physically unable to work which necessitates me supporting her— $75.00 per month. She owns her home. We keep in close contact as I am an only child."

4. On January 11, 1963, a San Jose lawyer wrote the draft board that Hamilton had been appointed by a California state court as conservator of his mother's estate. The lawyer also expressed fears that the mother's new husband might squander her small estate and said that the husband was doing nothing to support her.

5. On January 19, 1963, he filled out a new dependency questionnaire in which he said:

"Concerning Barbara [Hamilton] Harris—my mother—has remarried to an Albert Harris since the death of my father two years ago—I have become the conservator of her estate —my mother has a long case history of a disease called Parkinson's. This sickness attacks the nervous system—and affects the mind as well as the motor action of the body.

"Albert Harris is unable to support my mother, he has no job, and being an only son—if her estate were left in the wrong hands, I am afraid that my mother would be in serious trouble—at this time, I am now just beginning to bring in some income from her estate."

6. On February 27, 1963, he wrote the board:

"Director of Local Draft Board #30 Nevin Street Richmond, California

Dear Sir:

"This is in reference to my Notice of Induction in the United States Army.

"Because my Mother has been suffering from Parkinson's Disease, she is my direct responsibility. I respectfully request a postponement of my induction and a special hearing with regard to my unique situation.

"Thank you for your consideration of this matter
    Sincerely,
    /s/ ALLEN P. HAMILTON
    Allen P. Hamilton
905-¼ Hillgard
Westwood
Los Angeles 24, Calif."

1. On September 10, 1963, the President of the United States exempted married men from the draft, too late to help the appellant. 28 FR 9865.

7. About March 3, 1963, he wrote to the board that the board should have copies of the conservatorship proceedings. (The board responded by asking for details of the conservatorship, the value of the estate.)

8. On April 9, 1963, the board received from Hamilton a copy of his letters of conservatorship and the estate inventory. The inventory showed a house worth $15,000, cash in the amount of $1,944.77 and personal property worth $500.00.

9. On April 24, 1963, he sent the doctor's report on his mother to the board. The text of the report is as follows:

"April 18, 1963

"Mrs. Barbara Hamilton has been under the care of this office since March of 1951. At that time she was 31 years of age. She then had a moderately severe post-encephalitic Parkinsonism with frequent oculogyric crises. Superimposed on this was a marked emotional problem with considerable depression. She had, at that time, been under the care of a psychiatrist for approximately four years. Examination was not remarkable except for moderate obesity and the coarse tremor incident to Parkinsonism. She wept constantly during examination. During 1951 her symptoms were slightly improved by treatment of the Parkinsonism medically. She also had psoriasis, which responded poorly. She did fairly well while being closely watched and for a period of time, had less trouble with the Parkinsonian tremors and fewer oculogyric crises. However, during 1952, 1953, and 1954 depression and anxiety persisted. She continued to have several oculogyric crises per week. Various medications were tried to control her anxiety, depression, and Parkinsonism symptoms without too much success. During 1956 she improved somewhat on medication with Kemadrin, but continued to have many problems and many symptoms. She continued to gain weight. She had frequent respiratory infections. She remained quite depressed and during the last year during which I saw her, in 1960 and 1961, developed considerable mental difficulty. On one occasion suicide was attempted. Her husband died suddenly and this caused severe emotional disturbance.

"Following her last visit to my office in September, 1961, I continued to be aware of her problems and indirectly hear of mental difficulties. It is my understanding that she has further deteriorated since 1961.

"If there are any further questions concerning this case, I would be happy to furnish what information I can."

Hamilton carried the classification of I-A (eligible now) most of the time until May 17, 1962, when he was classified I-Y.[2] We take it that this latter classification, "not meeting current standards," grew out of his physical examination, because he had shortly before been advised to report in six months for another physical examination. (He had been injured in an automobile accident, as above noted.)

The last classification came on February 6, 1963, when he was classified I-A— notice went out that day of the classification. At this time the board exercised its discretion on Hamilton's claim of dependency. On February 25, a notice to report for induction on March 14 was sent from the board.

On February 27, 1963, Hamilton requested a hearing, he having received the notice of induction. On February 28, he wrote a more complete letter saying, because he was traveling, he did not

2. "In Class I-Y shall be placed any registrant who would have been classified in Class I-A or Class I-A-O as being currently available for service in the armed forces but for the fact that he has been found to be physically, mentally and morally qualified for such service only in time of war or national emergency declared by the Congress." 32 CFR 1622.17.

get his notice of classification until February 25, 1963.

The regulations allowing a personal hearing if request is made within ten days after classification[3] do not permit an extension because of failure to have one's mail promptly attended to and forwarded.[4] Further, after the order for induction was mailed, there would ordinarily be no right to be heard.[5]

But in our view the board did subsequently cancel its order to report by its postponement on March 6, 1963, "until further notice" of induction. Thus, after March 6, he was entitled to submit any proof of change of circumstance[6] since his last classification of February 6, 1963. But the trouble is that the material submitted after February 6, 1963, just does not show any change for the worse after that date.[7,8] Neither does it indicate the condition of the mother on February 6, 1963, was any worse than he had previously described it. We assume the board had a duty to examine whatever Hamilton sent in as papers. The record

indicates the board did. They found no new change in circumstances requiring a reopening. As a matter of fact, the doctor's letter shows that the mother was seriously suffering from Parkinson's disease when Hamilton was classified I-A in November, 1958.

The board could take notice that Hamilton was not physically caring for his mother and was not required to assume that the son would be displaced as the conservator by a California court. Our examination of the California statutes[9] leads us to believe that a conservator temporarily absent in the army would not be removed as conservator. And, we cannot assume that a California court would appoint a conservator of the type that Hamilton's lawyers paint the stepfather to be.

We cannot agree that the forwarding of the file to the appeal board in law[10] had constituted the local board's further consideration of the claim of dependency after he was classified I-A on February 6, 1963, an actual reopening.[11] For ex-

3. 32 CFR § 1624.1(a) (b).

4. The words of Hamilton's excuse were: "My job requires that I travel an extensive territory which takes me away from home for long periods of time. I was out of town and I did not see my mail which included notice of draft classification until Monday, February 25."

   We would think, assuming a correct address, that the Congress wanted the registrant to assume the burden of keeping in touch with his mail, rather than require the postman to find the registrant.

5. 32 CFR § 1625.1, § 1625.2.

6. 32 CFR § 1625.2, idem.

7. It is noted that Dr. Benner's letter of April 18, 1963, supra, does say, "It is my understanding that she has further deteriorated since 1961." We would not apply all common law evidence rules at the draft board, but this second hand hearsay does not point to anything occurring specifically after February 6, 1963.

8. Appellant relies heavily on United States v. Packer, 2 Cir., 200 F.2d 540, and United States v. Vincelli, 2 Cir., 215 F.2d 210, rehearing 216 F.2d 681. We think the cases quite distinguishable. For example, in Vincelli the matter was so handled that

he never had an opportunity to make a personal appearance before the board on his claim of minister's classification, IV-D. Here Hamilton can be presumed to have had his chance if he had attended to his mail in his absence. In Vincelli, he was clearly presenting new material somewhat as Hamilton had done prior to February 6, 1963. After the time for personal appearance had gone by, Hamilton's additional material really weakened his case.

9. Conservatorships operating in the geriatric field were provided for by the California Legislature in 1957. See Sections 1701 to 2207 of the California Probate Code.

10. It is to be noted that 32 CFR 1624.1 provides that "[S]uch 10-day period (to file a written request for personal appearance) may not be extended." 32 CFR 1626.2(d) provides that the local appeal board may accept excuses for not appealing on time. This it did on May 14, 1963, giving him all he had a right to plead for.

11. Coupled with the forwarding of the papers to the appeal board in Vincelli, cited in fn 8, supra, was a course of consideration by the board of a claim for IV-A classification really made for the

ample, the appeal board might have determined [12] Hamilton was entitled to a further hearing before the local draft board. But it did not. We do not say it should have. Further, it would appear that the appeal board did consider the appeal on the classification of February 6, 1963, on its merits.

Under the circumstances, Hamilton has been treated fairly by his government.[13]

It is all important in Vincelli, supra, that after he presented his material on a claim for IV-D classification, he never had a chance to appear before the board. There reconsideration was asked on a new ground. Hamilton had reconsideration, including a chance for personal appearance, if he had made the provisions for policing his own mail that the law required. It is much easier to hold there was a reconsideration on a new ground, as in Vincelli, than it is to say that there was or should have been a rereconsideration of the properly reconsidered new ground in Hamilton.

The parties are in agreement that the Secretary of Defense is not a proper party. As to him, the case is dismissed.

The order denying habeas corpus is affirmed.

first time (and no chance for personal appearance). Out of such a course, it is probably correct to hold there was a reopening. See In Re Lacharity, D.C., 53 F.Supp. 47, affirmed United States ex rel. Lacharity v. Commanding Officer, 2 Cir., 142 F.2d 381, to the effect that thinking about a consideration is a reconsideration.

12. See 32 CFR § 1626.23. On May 14, 1963, the board advised Hamilton that his new material did not warrant reopening of his classification.

13. 32 CFR 1625.4 provides:
When a registrant, any person who claims to be a dependent of a registrant, any person who has on file a written request for the current deferment of the registrant in a case involving occupational deferment, or the government appeal agent files with the local board a written request to reopen and consider anew the registrant's classification and the local board is of the opinion that the information accompanying such request *fails to present any facts in addition to those considered when the registrant was classified or, even if new facts are presented, the local board is of the opinion that such facts, if true, would not justify a change in such registrant's classification, it shall not reopen the registrant's classification.* In such a case, the local board, by letter, shall advise the person filing the request that the information submitted does not warrant the reopening of the registrant's classification and shall place a copy of the letter in the registrant's file. No other record of the receipt of such a request and the action taken thereon is required.